IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

_____

In re the Matter of:

JOHN JOSEPH TERRELL, *Petitioner/Appellee*,

*v.*

RUBY TORRES, *Respondent/Appellant*.

No. 1 CA-CV 17-0617 FC
FILED 6-6-2019

_____

Appeal from the Superior Court in Maricopa County
No.  FN 2016-001785
The Honorable Ronee Korbin Steiner, Judge

**VACATED AND REMANDED WITH INSTRUCTIONS**
_____

COUNSEL

Law Office of Dennis P. Levine PC, Phoenix
By Debora M. Levine
*Co-Counsel for Respondent/Appellant*

The Murray Law Offices PC, Scottsdale
By Stanley D. Murray
*Co-Counsel for Respondent/Appellant*

Stoddard Law Group PC, Phoenix
By Allie Stoddard
*Co-Counsel for Petitioner/Appellee*

Campbell Law Group PLLC, Phoenix
By Claudia D. Work
*Co-Counsel for Petitioner/Appellee*

Sherman & Howard LLC, Phoenix
By Christopher M. Jackson, *pro hac vice*, Matthew A. Hesketh
*Co-Counsel for Amicus Curiae Academy of Adoption & Assisted Reproduction Attorneys*

Daniel I. Ziskin PC, Phoenix
By Daniel I. Ziskin
*Co-Counsel* for *Amicus Curiae Academy of Adoption & Assisted Reproduction Attorneys*

---

**OPINION**

Judge Jennifer B. Campbell delivered the opinion of the Court, in which Judge James P. Beene joined.   Presiding Judge Maria Elena Cruz dissented.

---

**C A M P B E L L**, Judge:

¶1         Ruby Torres and John Joseph Terrell disagree about the disposition of cryogenically preserved embryos[1] created using Torres' eggs and Terrell's sperm. The dispute arose over whether, under the terms of their in vitro fertilization agreement ("IVF Agreement"), Torres could use the embryos for implantation without Terrell's consent. The parties did not challenge the jurisdiction of the family court.[2] Following an evidentiary

---

[1]    Arizona statute defines "human embryo" as "a living organism of the species homo sapiens through the first fifty-six days of its development, excluding any time during which its development has been suspended." Ariz. Rev. Stat. ("A.R.S.") § 36-2311(3). While other courts have used various terms including "preembryo," *A.Z. v. B.Z.*, 725 N.E.2d 1051, 1052 n.1 (Mass. 2000), and "pre-zygote," *Kass v. Kass*, 696 N.E.2d 174, 175 n.1 (N.Y. 1998), we use the term "embryo," in line with the legislature's definition. *See also Davis v. Davis*, 842 S.W.2d 588, 589 (Tenn. 1992) (similarly using the term "embryo").

[2]    In this case, the parties treated the embryos as joint property pursuant to statute, *see* A.R.S. § 25-318(A) (authorizing the court in a dissolution proceeding to divide property held in common equitably, though not

2

hearing, the court ordered the embryos to be donated to a third party for implantation. We vacate the trial court's order and hold that Torres may use the embryos to attempt to become pregnant.

## BACKGROUND

¶2　　　　In June 2014, Torres was diagnosed with an aggressive form of bilateral breast cancer. Torres' oncologist explained that she would need to begin chemotherapy within a month. The oncologist advised Torres that the chemotherapy would impair her ability to become pregnant by causing her to begin menopause, after which "there [was] no guarantee that [her] body would recover . . . and come out of menopause." The next month, after meeting with Dr. Millie Behera, a fertility specialist at the Bloom Reproductive Institute (the "Fertility Clinic"), she elected to undergo IVF to produce embryos, using her own eggs and donor sperm.

¶3　　　　Torres initially asked Terrell, then her boyfriend, to serve as the sperm donor, but he declined. She began the process of preserving her eggs and found another sperm donor, a prior boyfriend. Upon learning of the other volunteer donor, Terrell changed his mind and agreed to be the donor. He later testified he only did this as a favor.

¶4　　　　On July 11, 2014, the parties executed the IVF Agreement, provided by the Fertility Clinic, which included terms regarding the parties' informed consent for assisted reproduction, the cryopreservation of embryos, and the disposition of any embryos that might result from the IVF procedure. The IVF Agreement specified that any embryo resulting from Torres' egg and Terrell's sperm would be their joint property.

¶5　　　　The IVF Agreement also contained a provision addressing the parties' preferences regarding the disposition of embryos (the "Disposition Provision"), stating, as relevant:

> 10. Disposition of Embryos — Because of the possibility of you and/or your partner's separation, divorce, death or incapacitation . . . it is important to decide on the disposition of any embryos that remain in the laboratory in these situations. Since this is a rapidly evolving field, both medically and legally, the clinic cannot guarantee what the

necessarily in kind), although they could have simply brought a contract action. Neither party objected to the family court resolving this issue. The outcome of this matter is not dependent upon their marital status.

3

available or acceptable avenues for disposition will be at any future date.

Currently, the three alternatives are:

1. Discarding the cryopreserved embryo(s)

2. Donating the cryopreserved embryo(s) to another couple in order to attempt pregnancy.

. . .

3. Use by one partner with the contemporaneous permission of the other for that use.

This agreement provides several choices for disposition of embryos in these circumstances ([including] separation or divorce of the patient and her spouse/partner . . .). *Disposition may also be controlled by the final decision of a court or other governmental authority having jurisdiction.*

I/We agree that in the absence of a more recent written and witnessed consent form, Fertility Treatment Center is authorized to act on our choices indicated below (items A-H), so far as it is practical.

(Emphasis added.)

¶6          The Disposition Provision also contained the following general language entitled "Note":

Embryos cannot be used to produce pregnancy against the wishes of the partner. For example, in the event of a separation or divorce, embryos cannot be used to create a pregnancy *without the express, written consent of both parties*, even if donor gametes were used to create the embryos.

(Emphasis added.)

¶7          The Disposition Provision then identified various options for the disposition of embryos, in differing future circumstances, such as death of one or both parties, separation, or divorce. Specifically, subsection H addressed the parties' options upon divorce or dissolution of their relationship:

H. <u>Divorce or Dissolution of Relationship</u> In the event the patient and her spouse are divorced or the patient and her partner dissolve their relationship, we agree that the embryos should be disposed of in the following manner (check one box only).

[1] A court decree and/or settlement agreement will be presented to the Clinic directing use to achieve a pregnancy in one of us or donation to another couple for that purpose.

[2] Destroy the embryos.

The parties selected and initialed the first option placing the disposition decision in the hands of the court. This is the sole provision in the Disposition Provision of the Agreement between the parties and not between the clinic and the parties jointly.

¶8          Four days after signing the IVF Agreement, the parties married. The IVF procedure yielded seven viable embryos which were cryogenically preserved for future use. Torres subsequently underwent chemotherapy, causing her hormone levels to drop to menopausal amounts. After two years of marriage, Terrell filed a petition for dissolution of marriage. The seven embryos were still preserved and there had been no attempt at implantation. The parties could not agree on the disposition of the embryos—the primary dispute was whether the court could award Torres the embryos to achieve a pregnancy.[3]

¶9          At the evidentiary hearing, neither party contested that the IVF Agreement represented a valid, binding agreement regarding the disposition of the embryos. Terrell explained he elected to sign the IVF Agreement because he believed it was "honorable" to do so under the circumstances. Relying on the "Note," Terrell testified he never intended for Torres to use the embryos without his consent. He explained that when he signed the IVF Agreement, he hoped to have children with Torres "[i]f she survived," but at that time he thought her survival unlikely.

---

[3]          Terrell's position regarding disposition of the embryos changed during the proceedings: he initially argued the embryos should be destroyed; later he took the position that he should be awarded the embryos to prevent Torres from procreating against his wishes; and still later stated he would agree to their use by a third party, rather than having the embryos stored in perpetuity.

¶10          Terrell also claimed that he only married Torres because she needed health insurance; he went so far as to testify he would not have married her but for that need. Indeed, when asked by counsel if he would have "married [Torres] if she had not presented to [him] that she had cancer and needed [his] health insurance," he responded "[n]o."

¶11          Terrell did not want Torres to have the embryos because he was concerned about his "financial liability in the future, . . . as far as . . . [his] inheritance or, [an obligation to pay] child support for a child that [he] would[] never see[]." Terrell also stated concerns about the possibility of Torres "poisoning" a child against him and "painting" him as a "monster." When questioned by the court as to whether he could "co-parent" with Torres, he answered "[n]o." Torres testified that, should she conceive a child from the embryos, it would be Terrell's choice whether he wished to be involved in the child's life. Torres also testified that she would not seek child support from Terrell, and planned to implant the embryos when, and if, she remarried.

¶12          Torres and Dr. Behera, the fertility specialist, both testified that without the embryos, Torres would be unable to have biological children because her hormone levels were menopausal after chemotherapy. Behera testified that Torres' lab work indicated "low to no" ovarian function. Behera also testified that if Torres took medication to stimulate her ovaries "it probably would not result in any viable eggs." Agreeing that only in a "miraculous situation" Torres could achieve "a postmenopausal pregnancy," Behera testified that there was a "less than 1 percent" chance of that occurring. Behera went on to explain that the waiting list for obtaining donated embryos was long. Torres testified that although she had considered adoption, due to her cancer diagnosis and a genetic mutation "BRCA1" that increased her cancer risk, it was "unlikely" she would be considered as an adoptive placement.

¶13          In the decree of dissolution, the family court noted there is no Arizona case law or statutory authority addressing the disposition of embryos in a dissolution proceeding. The court analyzed out-of-state case law and identified three approaches adopted by other courts: (1) the contract approach, (2) the balancing approach, and (3) the contemporaneous mutual consent approach.

¶14          The trial court found that because the parties disagreed on the disposition of the embryos, and because the parties had consented to a judicial determination for disposition in the event of a dissolution, it should apply a balancing approach based on the language of the IVF Agreement.

Analyzing the parties' competing interests, *infra* ¶ 45, the court concluded that Terrell's "right not to be compelled to be a parent outweigh[ed] [Torres'] right to procreate and desire to have a biologically related child." The trial court directed the Fertility Clinic to donate any remaining embryos to a third party or couple.

**¶15**        Torres timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") § 12-2101(A)(1).

## DISCUSSION

### I.        Overview: The Law of Other States

**¶16**        This is a case of first impression in Arizona. To begin, we must determine what law should govern the disposition of cryogenically preserved embryos created using one party's eggs and another party's sperm when the parties disagree. An overview of how other states have approached this issue provides significant context for this analysis.

#### A.        The Contract Approach

**¶17**        Under the contract approach, an agreement between progenitors, or gamete donors, regarding disposition of embryos is generally presumed to be valid and binding, and will be enforced. *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998). Some courts have held that such agreements are enforceable "subject to mutual change of mind" by the parties. *Id.*; *In re Marriage of Dahl & Angle*, 194 P.3d 834, 840 (Or. Ct. App. 2008) (citation omitted). *Cf. J.B. v. M.B.*, 783 A.2d 707, 719 (N.J. 2001) (holding that a mutual change of mind is not required and that agreements entered into at the time of IVF will be enforced "subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored [embryos]").[4]

**¶18**        The contract approach was first enunciated in *Davis v. Davis*, 842 S.W.2d 588, 597 (Tenn. 1992). That case involved dissolution proceedings, in which there was no prior agreement between the parties, a husband and wife, regarding the disposition of cryogenically preserved embryos.[5] *Id.* at 598. The court concluded as a matter of first impression that

---

[4]        Courts that have adopted this approach have also first considered whether enforcing the parties' prior agreement would violate state public policy. Neither party in this matter argues that the contract approach violates Arizona public policy.

[5]        We discuss this case in more detail below. *Infra* ¶¶ 26-28.

the contract approach should be the preferred method for resolving similar disputes, stating:

> We believe, as a starting point, that an agreement regarding disposition of any untransferred [embryos] in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors.

*Id.* at 597. The *Davis* court noted such an approach enables "the progenitors, having provided the gametic material giving rise to the [embryos], [to] retain decision-making authority as to their disposition." *Id.*

¶19 The contract approach has been the most preferred and most adopted approach nationwide. *See Szafranski v. Dunston ("Szafranski I")*, 993 N.E.2d 502, 514, ¶ 40 (Ill. App. Ct. 2013); *Dahl & Angle*, 194 P.3d at 840-41; *Roman v. Roman*, 193 S.W.3d 40, 50 (Tex. App. 2006); *Litowitz v. Litowitz*, 48 P.3d 261, 267 (Wash. 2002); *J.B.*, 783 A.2d at 719; *Kass*, 696 N.E.2d at 180; *Davis*, 842 S.W.2d at 597. *But see A.Z. v. B.Z.*, 725 N.E.2d 1051, 1057-58 (Mass. 2000) (rejecting the contract approach and concluding that it violated public policy to enforce a contract "that would compel one donor to become a parent against his or her will").

¶20 Courts across jurisdictions have generally agreed that the primary benefit of the contract approach is that it leaves deeply personal decisions involving reproductive choices in the hands of the parties. *Szafranski I*, 993 N.E.2d at 506, ¶ 18 ("[A] benefit[] of a contractual approach is that . . . it removes state and court involvement in private family decisions."). That is, enforcing the parties' prior agreements has the benefit of "both minimiz[ing] misunderstandings and maximiz[ing] procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision." *Roman*, 193 S.W.3d at 50 (quoting *Kass*, 696 N.E.2d at 180).

¶21 The contract approach also provides certainty that the contract will be binding and provides an opportunity for the parties to carefully reflect on their different options and to think through their preferences under different circumstances. *Szafranski I*, 993 N.E.2d at 515, ¶ 41 ("[H]onoring such agreements will promote serious discussions between the parties prior to participating in [IVF] regarding their desires, intentions, and concerns."); *Kass*, 696 N.E.2d at 180 ("[P]arties should be encouraged in advance, before embarking on IVF and cryopreservation, to

think through possible contingencies and carefully specify their wishes in writing."). Moreover, the contract approach "encourages parties to enter into agreements that will avoid future costly litigation." *Szafranski I*, 993 N.E.2d at 506, ¶ 18.

**¶22**     The primary criticism of the contract approach is that there are numerous "uncertainties inherent in the IVF process" that "extend[] the viability of [embryos] indefinitely and allow[] time for minds, and circumstances, to change." *Kass*, 696 N.E.2d at 180. The court in *Davis* agreed:

> [W]e recognize that life is not static, and that human emotions run particularly high when a married couple is attempting to overcome infertility problems. It follows that the parties' initial "informed consent" to IVF procedures will often not be truly informed because of the near impossibility of anticipating, emotionally and psychologically, all the turns that events may take as the IVF process unfolds.

842 S.W.2d at 597; *see also In re Marriage of Witten*, 672 N.W.2d 768, 777 (Iowa 2003) (noting criticism that the contract approach "insufficiently protects the individual and societal interests at stake" by enforcing terms that may be inconsistent with a party's present "wishes, values, and beliefs" regarding "matters of such fundamental personal importance" (quoting Carl H. Coleman, *Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes*, 84 Minn. L. Rev. 55, 88 (1999))).

**¶23**     Another concern with the contract approach is that, as here, the IVF Agreement directing disposition of any embryos may be only part of the informed consent agreement with the Fertility Clinic, which also contains information on the risks of IVF treatment, and therefore can include "anxiety-producing information a patient might be inclined to resist or ignore." Ellen A. Waldman, *Disputing Over Embryos: Of Contracts and Consents*, 32 Ariz. St. L.J. 897, 924 (2000). Combining such medical information with contract provisions regarding divorce and other difficult subjects may make future determinations even more difficult because it adds more "information that is difficult to process and thoughtfully evaluate." *Id*. at 924-25.

**¶24**     Courts have addressed these concerns by permitting parties to subsequently jointly modify their initial agreement. *See Kass*, 696 N.E.2d at 180; *see also Davis*, 842 S.W.2d at 597 (concluding that permitting initial

agreements to be modified by a subsequent agreement will protect the parties against some of the risks of uncertainty and high emotions). The ability to subsequently amend an agreement allows the parties flexibility to adapt the agreement to changing circumstances to address any new concerns.

### B.    Balancing Approach

¶25    Next is the balancing approach, where a court balances the competing interests of the parties. *Davis*, 842 S.W.2d at 603. That is, courts will "consider the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions." *Id.* Courts have applied the balancing approach when they are unable to enforce a prior written agreement because it is ambiguous, the agreement grants the court the authority to make the disposition decision, or there is no agreement to enforce. *See id.*; *Reber v. Reiss*, 42 A.3d 1131, 1136 (Pa. Super. Ct. 2012).

¶26    *Davis* provides a framework for analyzing the disposition of embryos outside of a written agreement. In *Davis*, a husband and wife had not entered into any agreement regarding the disposition of embryos in the event of a dissolution. *Davis*, 842 S.W.2d at 598. The wife wished to donate the embryos to another couple. *Id.* at 604. The husband, however, wanted the embryos destroyed. *Id.* at 603-04. After considering the wife's interest in knowing that the "lengthy IVF procedures" she had endured were not "futile," the court concluded that the wife's "interest in donation [was] not as significant as the [husband's] interest . . . in avoiding parenthood." *Id.* at 604.

¶27    The *Davis* court applied the following framework to balance the interests of the parties in the absence of a contract:

> Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the [embryos] in question. If no other reasonable alternatives exist, then the argument in favor of using the [embryos] to achieve pregnancy should be considered.

*Id.*

¶28    To this end, the *Davis* court also concluded that "[t]he case would be closer if [the wife] were seeking to use the [embryos] herself, but only if she could not achieve parenthood by any other reasonable means."

*Id.* The court noted that the wife still had the opportunity to undergo further IVF procedures, as she was still able to harvest viable eggs. *Id.* Additionally, she had previously attempted to adopt and therefore exhibited a willingness to "forgo genetic parenthood." *Id.*

¶29        The balancing approach requires a fact-intensive inquiry looking at the parties' interests in light of both current circumstances and those existing at the time of the IVF treatment. A party's interest in parenthood includes the party's interest in having a biologically-related child. The interest in parenthood, however, is broader than that, and may also include adoption. *Cf. Reber*, 42 A.3d at 1138 ("[S]imply because adoption or foster parenting may be available . . . does not mean that such options should be given equal weight in a balancing test."). *Contra In re Marriage of Rooks*, 429 P.3d 579, 594, ¶ 71 (Colo. 2018) ("[B]ecause . . . the relevant interest at stake is . . . achieving or avoiding *genetic* parenthood, courts should not consider whether a spouse seeking to use the []embryos to become a genetic parent could instead adopt a child or otherwise parent non-biological children.").

¶30        Other courts have applied the *Davis* framework. *See Szafranski v. Dunston ("Szafranski II")*, 34 N.E.3d 1132, 1161-62, ¶¶ 124-29 (Ill. App. Ct. 2015); *Szafranski I*, 993 N.E.2d at 515, ¶ 42; *Reber*, 42 A.3d at 1137-42. *Cf. J.B.*, 783 A.2d at 716, 720 (agreeing the party wishing to avoid procreation should ordinarily prevail, but "express[ing] no opinion in respect of a case in which a party who has become infertile seeks use of stored [embryos] against the wishes of his or her partner, noting only that the possibility of adoption also may be a consideration, among others, in the court's assessment").

### C.        Contemporaneous Mutual Consent

¶31        Finally, there is the contemporaneous mutual consent approach, which has only been adopted by the Iowa Supreme Court. *Witten*, 672 N.W.2d 768.[6]   Under this approach, "no transfer, release, disposition, or use of the embryos can occur without the signed

---

[6]        *But see McQueen v. Gadberry*, 507 S.W.3d 127, 157-58 (Mo. Ct. App. 2016) (without explicitly adopting the contemporaneous mutual consent approach, affirming the trial court's judgment which jointly awarded embryos to a divorcing couple and ordered that the embryos could not be released for any use without the signed authorization of both parties).

authorization of both donors. If a stalemate results, the status quo would be maintained." *Id.* at 783.

**¶32** This approach attempts to avoid many of the concerns regarding judicial or state interference in individual reproductive choices, which involve "highly personal" and "intensely emotional matters." *Id.* at 777-79, 781. This approach has been criticized "as being totally unrealistic" given that "[i]f the parties could reach an agreement, they would not be in court." *Reber*, 42 A.3d at 1135 n.5. For instance, it "give[s] each progenitor a powerful bargaining chip at a time when individuals might very well be tempted to punish their soon-to-be ex-spouses." *Szafranski I*, 993 N.E.2d at 512, ¶ 31 (citing Mark P. Strasser, *You Take the Embryos But I Get the House (and the Business): Recent Trends in Awards Involving Embryos Upon Divorce*, 57 Buff. L. Rev. 1159, 1225 (2009)). As such, applying this approach "invite[s] individuals to hold hostage their ex-partner's ability to parent a biologically related child in order to punish or to gain other advantages." *Id.* We agree with such criticism. We decline to give one party a blanket veto and accordingly reject this approach.

## II. Adoption of the Contract Approach

**¶33** Having considered each approach, we agree with the majority of jurisdictions and adopt the contract approach. As the dissent points out—and to which the majority agrees—contracts matter. Specifically, we hold that "[a]greements between progenitors, or gamete donors, regarding disposition of their [embryos] should generally be presumed valid binding, and enforced in any dispute between them." *Kass*, 696 N.E.2d at 180. Such agreements, like any contract, can subsequently be modified by written agreement. If the parties have no prior agreement, or if the agreement leaves the decision to the court, the balancing approach provides the proper framework for the determination.[7] Such a framework "recognizes that both

---

[7] During the pendency of this appeal, Arizona adopted a new statute governing the disposition of embryos in a proceeding for dissolution of marriage or legal separation. *See* A.R.S. § 25-318.03. This statute only applies to married couples and will not resolve similar disputes between unmarried persons in the future. *See* A.R.S. § 25-318.03(A); A.R.S. § 25-318(A). The statute directs courts to "[a]ward the in vitro human embryos to the spouse who intends to allow the in vitro human embryos to develop to birth." A.R.S. § 25-318.03(A)(1). Even if the spouses have a disposition agreement, the statute requires the court to award the embryos as prescribed by the statute. A.R.S. § 25-318.03(B). The statute was not in

spouses have equally valid, constitutionally based interests in procreational autonomy . . . [and] encourages couples to record their mutual consent regarding the disposition of remaining [embryos] in the event of divorce by an express agreement." *Rooks*, 429 P.3d at 594, ¶ 72.

**¶34** In applying the balancing approach, we agree with other jurisdictions that the party who does not wish to become a parent should prevail if the other party has a "reasonable possibility" of becoming a parent without the use of the embryos. *Davis*, 842 S.W.2d at 604 ("If no other reasonable alternatives exist, then the argument in favor of using the [embryos] to achieve pregnancy should be considered."); *Szafranski I*, 993 N.E.2d at 515, ¶ 42; *J.B.*, 783 A.2d at 719-20.

**¶35** Applying these principles, we turn to the facts of this case.

## III. Decree of Dissolution

### A. The IVF Agreement

**¶36** The trial court correctly started its analysis with the parties' contract. Neither party disputes that the IVF Agreement is a valid and enforceable agreement. At issue is how the contract is to be interpreted.

**¶37** Torres argues section H of the IVF Agreement "clearly shows that the parties intended for the trial court to make the decision as to the disposition of the frozen embryos." In contrast, Terrell argues that the contract unambiguously provides that the court cannot award one party the embryos without the express written consent of both parties.

**¶38** "The interpretation of a contract is a matter of law, which we review de novo." *Earle Invs., LLC v. S. Desert Med. Ctr. Partners*, 242 Ariz. 252, 255, ¶ 14 (App. 2017). "When interpreting a contract . . . it is fundamental that a court attempt to 'ascertain and give effect to the intention of the parties at the time the contract was made if at all possible.'" *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153 (1993) (quoting *Polk v. Koerner*, 111 Ariz. 493, 495 (1975)). "To determine the parties' intent, we 'look to the plain meaning of the words as viewed in the context of the contract as a whole.'" *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 290-91, ¶ 15 (App. 2010) (quoting *United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 259 (App. 1983)). When the terms of a valid contract are clear and unambiguous we must give effect to the contract as written. *Grubb & Ellis*

---

effect at the time the trial court made its decision and we are not bound by it in reaching a resolution.

*Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz. 83, 86, ¶ 12 (App. 2006). "In interpreting a contract, we attempt to reconcile and give meaning to all its terms." *Weatherguard Roofing Co., Inc. v. D.R. Ward Const. Co., Inc.*, 214 Ariz. 344, 350, ¶ 27 (App. 2007). Moreover, we must give greater weight to specific provisions—namely those that require an affirmative response from the parties—in a contract "because specific contract provisions express the parties' intent more precisely than general provisions." *ELM*, 226 Ariz. at 291, ¶ 18 (citation omitted).

**¶39** The "Note," which Terrell relies on, states that "in the event of a separation or divorce, embryos cannot be used to create a pregnancy without the express, written consent of both parties." Just three pages later, the parties provided the necessary "express, written consent" in subsection H. The parties affirmatively elected that upon divorce or dissolution of their relationship, a court could either award one party the embryos for implantation or award the embryos to a third party for implantation. Moreover, the parties acknowledged they could later change their selections for disposition, "but need[ed] [a] mutual and written agreement" to do so. Subsection H unambiguously governs disposition of the embryos by providing the written consent to overcome the more general "Note." *See id.* In making the choice to allow the court to determine the disposition, the court was required to employ the balancing approach.[8]

**¶40** We reject Terrell's argument that section H was included because "if the parties [had] reached an agreement as to final disposition, that agreement would, necessarily, and pursuant to Arizona law, [be] included in either a decree or settlement agreement [pursuant to Arizona Rule of Family Law Procedure 69(A)]." The IVF Agreement makes clear that the parties were free "at any time" to jointly enter into a new agreement and revise their disposition choices—had the parties reached a new agreement, the clinic would honor the parties' choice. Absent such an agreement to modify their choices for disposition of the embryos, the

---

[8] We further note that the IVF Agreement provided three "alternatives" for disposition of the embryos: discarding the embryos, donation to third party to attempt to achieve pregnancy, and use by one partner with "contemporaneous permission" of the other partner. *Supra* ¶ 5. Immediately following that statement, however, the IVF Agreement also states that the disposition of the embryos "may also be controlled by the final decision of a court or other governmental authority having jurisdiction." The parties were therefore aware that the three listed "alternatives" were not exhaustive.

original IVF Agreement applies, and court intervention and decision-making was mandated.

**¶41** Terrell next argues that subsection H refers only to divorce, "[t]o read the [IVF Agreement] as allowing a court to direct use of the embryos by one-half of a divorcing couple, but as not allowing such an option to couples who are unmarried and breaking up, or legally separating, is nonsensical." Terrell simply did not read the contractual provision fully. Subsection H of the IVF Agreement applies to the disposition of the embryos in the event of "[d]ivorce" or "[d]issolution of [r]elationship" and, as such, is not limited to divorcing couples. Thus, we do not interpret the IVF Agreement differently depending on the marital status of the contracting parties.

**¶42** The dissent posits that our reading of the IVF Agreement renders the "Note" meaningless. It does not. The converse is actually true. If the "Note" controls, it renders meaningless the parties' election in the Disposition Provision, which allows the court to award the embryos to one party for all purposes, including "use to *achieve a pregnancy* in one of us or donation to another couple *for that purpose*." (Emphasis added.) With the dissent's construction of the "Note," only if the parties agree would implantation be possible, which runs against the plain language of Terrell's and Torres' election in section H. The majority considered each provision of the contract together to determine that, by written consent of the parties, the court was authorized to make the disposition determination for the embryos in this case. *See id.* ("[E]ach part of a contract must be read together, 'to bring harmony, if possible, between all parts of the writing.'" (citation omitted)).

### B. Balance of Interests

**¶43** Given the authorization granted to the court in the IVF Agreement, we must now proceed to balance the interests of the parties. Application of the balancing approach involves mixed questions of law and fact, which we review de novo. *See Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 233, ¶ 8 (App. 2005). We accept the trial court's factual findings unless they are clearly erroneous. *In re Estate of Newman*, 219 Ariz. 260, 265, ¶ 13 (App. 2008). *See also Phoenix Newspapers, Inc. v. Keegan*, 201 Ariz. 344, 349, ¶ 21 (App. 2001) ("We can decide whether the superior court correctly balanced the interests only after considering what it found as facts.").

¶44        The balancing approach allows the consideration of parol evidence. *See generally Davis*, 842 S.W.2d at 603-04. In reviewing the application of a balancing test, we accept the trial court's factual determinations. *See Scottsdale Unified Sch. Dist. No. 48 of Maricopa Cty. v. KPNX Broad. Co.*, 191 Ariz. 297, 302 (1998). "We are, however, free to draw our own conclusions of law from these facts." *Id.* To do so is not to reweigh evidence, because as a matter of first impression, the trial court's application of the law to its findings created the error.

¶45        The trial court found that Torres had a strong interest in having her own biologically-related child and it was "extremely improbable" that Torres could achieve a post-menopausal pregnancy without the embryos. Torres had other avenues to parenthood, as further noted by the trial court: "[Torres could] still adopt or seek donation of other embryos, even if the options are more difficult" or "not as desirable as having a biological child of her own." The trial court found Terrell "would face the potential of significant financial responsibilities that despite [Torres'] position cannot be waived by her." The court further concluded that "[Terrell] ha[d] legitimate concerns about parenting with [Torres]" and it was "unlikely the parties [would] be able to co-parent." The court also found credible Terrell's testimony that he "never intended on having children with [Torres] if the parties were not together."

¶46        Here it is undisputed that the sole purpose of the IVF process was for Torres to preserve her ability to have biological offspring. She began the IVF procedure immediately after receiving her cancer diagnosis and information that cancer treatment would likely make it impossible to become a biological parent through normal means. Following her doctor's advice and expertise, Torres elected to preserve embryos, increasing her chances of successful procreation. As explained by Dr. Behera, the most stable preservation method to ensure successful reproduction in the future was to freeze fertilized eggs, or embryos. With this information, Torres located a donor who was prepared to assist in the creation of fertilized eggs. It was only after hearing about the other donor that Terrell agreed to provide his gametes. Although the trial court found that Torres had less than a one percent chance of having biological children through normal means of pregnancy, and that she had gone through great pains to preserve a method by which she could have biological children, the court nevertheless appeared to conclude that the mere possibility that Torres could conceive and bear a biological child after her cancer treatment tipped the balance against Torres' claims to the embryos.

¶47  The trial court erred by improperly concluding Torres' "less than one percent" chance of becoming pregnant through normal means and the remote possibility of adoption or insemination with a donor embryo negated her claims to these embryos. The trial court overstated Torres' ability to become a parent through means other than the use of the disputed embryos. Moreover, the court gave insufficient weight to Torres' desire to have a biologically-related child—which was the entire purpose of engaging in IVF in the first place. In regard to her other avenues of parenthood, Behera gave unrebutted testimony explaining that embryo donation involved being placed on a long waiting list due to the limited number of embryos available. Torres testified that adoption was "unlikely" not only for the reason outlined by Behera, but also because of her medical history, which includes a genetic mutation that substantially increases her risk of cancer. This leaves Torres with less than a one percent chance of having a biological child and only a speculative chance of having children in the future.

¶48  Additionally, the trial court erred when it placed heavy weight on the parties' inability to "co-parent." Nothing in the record suggests that either of them expected or intended to co-parent any offspring derived from the embryos. As the trial court found, "[Torres left] the choice to [Terrell] to be involved or not to be involved in the life of a child if awarded the embryos." At no point did Terrell indicate he had any desire to be a part of a child's life; in fact, he anticipated he may never see children resulting from the IVF procedure.

¶49  The trial court determined that the parties' decision to use IVF—as opposed to freezing "just" Torres' eggs—weighed against her. As the court explained, had she frozen just her eggs, "there would be no further dispute, as [Torres'] eggs would be her sole property and it would not involve the potential of [Terrell] becoming a father against his wishes." This was also error. Not only was Torres' decision to freeze embryos medically supported, the court also heard uncontested testimony that Torres gave up a ready and willing alternate gamete donor. Without Terrell's intervention, Torres would likely have viable cryogenically preserved embryos ready for implantation, as she planned.

¶50  The trial court found the parties "did not contemplate a marriage and . . . bringing children into the world in the typical manner [and] [a]s a result of [Torres'] cancer diagnosis, the parties' actions were more impulsive and expedient." It later credited Terrell's testimony that he did not intend to have children with Torres if the marriage failed, based in part on its finding that "[t]here was no evidence presented that after the

marriage the parties, for example, discussed having children regardless of the status of their relationship."

¶51         While the record supports the conclusion that the parties may not have discussed having children after they married, this is irrelevant to the parties' decision to jointly fertilize embryos. Nothing in the record demonstrates that the IVF Agreement was entered into impulsively or done in contemplation of marriage. Torres, facing infertility and a serious cancer diagnosis, was advised that the only way to preserve her fertility with certainty was to undergo IVF treatments. Torres began IVF with an immediate and specific intent to preserve her fertility. To be sure, the parties entered into the IVF Agreement expediently, but the record shows it was done with deliberation. The fact that Torres had already enlisted the assistance of a different donor demonstrates her purpose—to preserve her ability to have a biologically related child, or children, and not to simply have a child biologically related to Terrell. Even though Terrell doubted Torres would survive the cancer when he entered into the IVF Agreement, his doubts that Torres would live long enough to use the embryos in the future does not relieve him of his obligations under the contract. Torres and Terrell sought to jointly preserve Torres' fertility, and not simply to have a child within a marriage, or even within a relationship.

¶52         It is of course true that if Torres were awarded the embryos, Terrell could be legally responsible to financially support the children.[9] *See* A.R.S. § 25-814(A)(2) (presumption of paternity); *McLaughlin v. Jones ex rel Pima Cty.*, 243 Ariz. 29, 36, ¶ 29 (2017). That reality is the same today as it was when the parties executed the IVF Agreement nearly four years ago.

¶53         Finally, we note the trial court erred as a matter of law to the extent that it considered and relied on a constitutional right to procreational autonomy to resolve the dispute. The trial court appeared to balance what it construed as Torres' "constitutionally established right to procreate" against Terrell's "right not to procreate." Although expressing some skepticism as to whether such "rights" pertained to an agreement between the parties, and as to whether there is in fact a "right" not to procreate, the trial court nonetheless concluded that Terrell's "right not to be compelled

---

[9]         *See Albins v. Elovitz*, 164 Ariz. 99, 102 (App. 1990) (noting that a custodial parent may waive child support payments, but "any such agreement[s] [are] not binding on the court and will be enforced only so long as the interest of the child is not adversely affected.").

to be a parent outweigh[ed] [Torres'] right to procreate and desire to have . . . child[ren]."[10]

¶54 We do not agree that such a framework is useful or applicable when two individuals no longer agree on the disposition of embryos and the disagreement cannot be resolved by the terms of a prior agreement. Such constitutional rights are directed at protecting an individual against government intrusion on personal decisions regarding reproduction. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 849 (1992); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Skinner v. Okla. ex rel. Williamson*, 316 U.S. 535, 541-42 (1942). Here, the parties specifically empowered the court to decide any future dispute regarding disposition of the embryos. As such, the trial court erred in concluding the dispute here involved a "right" to procreate and a "right" not to procreate. Under the balancing approach, the trial court should have only considered the parties' competing and varying interests.[11]

¶55 We have not, as suggested by the dissent, failed to give due weight and consideration to the trial court, but have adopted its factual findings in reaching our decision. Even as we defer to the court's factual findings, we must hold that the court erred in its application of the balancing approach. This case presents compelling factual support for awarding the embryos to Torres. If the factual underpinnings found by the court here do not support Torres' claim to the embryos, then there is likely

---

[10] For instance, the trial court found that "to the extent either party had a constitutional right regarding procreation with *these* embryos, they both waived the right by . . . signing and executing . . . an agreement." (Emphasis added.)

[11] We note that the trial court also found that awarding Torres the embryos to achieve pregnancy was against public policy because "litigation" over a potential child was "inherent" and would be contrary to A.R.S. § 25-103 (declaring the public policy of this state and the general purposes of Title 25 are "[t]o promote strong families [and] . . . strong family values"). We disagree. Section 25-103 is inapplicable. To apply it to these circumstances, in which one party wants to use embryos to procreate and the other party objects, would always necessarily tip the balance in favor of the objecting party; thus, it would functionally operate to give greater weight to the objecting party's interests much in the same way that the contemporaneous mutual consent approach operates to give the objecting party greater power in a dispute. Further, any conclusion as to whether implantation of the embryos would result in "strong" families and family values is speculative.

19

no factual scenario which would result in the award of the embryos to one party over the objection of the other. The result reached by the trial court, therefore, would be a de facto adoption of the contemporaneous mutual consent approach—an approach we have rejected. *Supra* ¶ 32.

¶56 After reviewing the record, deferring to the superior court's factual findings, we apply the balancing approach to the competing interests. The majority finds Torres' interests in the embryos—especially given that she gave up the opportunity to use another donor and she is likely unable to become a parent (biological or otherwise) through other means—outweighs Terrell's interest in avoiding procreation. We therefore vacate the trial court's order and remand to the trial court to enter an order awarding Torres the embryos.

## IV.    Attorney Fees

¶57 Pursuant to A.R.S. § 25-324(A), the trial court has discretion to award a party's reasonable attorney fees "after considering the financial resources of both parties and the reasonableness of the positions each party has taken." We review the trial court's award of attorney fees for an abuse of discretion. *Murray v. Murray*, 239 Ariz. 174, 179, ¶ 20 (App. 2016).

¶58 In the decree, the trial court denied Torres' request for attorney fees and costs after finding "there [was] not a substantial disparity of financial resources between the parties" and "both parties acted unreasonably in a limited way but neither more than the other." Specifically, the trial court found that Torres had acted unreasonably in refusing to "refund [Terrell]'s insurance premiums until just before trial started, even though the law supports such reimbursement." Torres does not contest the trial court's finding regarding the disparity of income. Instead, she contests the trial court's finding that she acted unreasonably and further argues, "[c]ompared to the number of instances showing [Terrell]'s positions were unreasonable, [the] one instance of Torres' unreasonableness does not justify completely [denying] her request for an award of attorney[] fees."

¶59 Even assuming it is undisputed that Terrell was entitled to reimbursement of the insurance premiums, the record supports Torres' contention that Terrell did not request reimbursement until a week before the evidentiary hearing, in the pretrial statement. At the start of the hearing, the parties reached a binding agreement that Torres would reimburse Terrell $2,508.54 for the post-service insurance premiums and waived the issue for purposes of the hearing. Although the trial court has discretion in

determining when a party is unreasonable, based on this record, the trial court abused its discretion in concluding that Torres acted unreasonably.

¶60        We therefore remand the matter to the trial court, for purposes of reassessing Torres' request for attorney fees consistent with A.R.S. § 25-324(A) and our conclusion that Torres was not unreasonable.

## CONCLUSION

¶61        For the forgoing reasons, we vacate the trial court's order directing the embryos be donated to a third party. We remand the matter for the trial court to enter an order awarding Torres the embryos, and for the trial court to reconsider its denial of attorney fees. We deny Torres' request for attorney fees, but grant her costs on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21. *See* A.R.S. § 12-341.

C R U Z, Judge, dissenting:

¶62        Contracts matter.  Arizona's Constitution protects individual rights when it explicitly prohibits the impairment of contractual obligations.  Ariz. Const. art. II, § 25.  Accordingly, I must respectfully dissent.

¶63        The majority holds the trial court erred *as a matter of law* by not awarding the embryos to Torres, even though:

   (1) Neither party disputes the enforceability of the Agreement between each other, *see supra* ¶ 36; and

   (2) Only the interpretation of the contract language is at issue, *see id.*, and a specific contract provision, which is entitled to greater weight under contract law, expresses the parties' precise intent that "[e]mbryos cannot be used to produce pregnancy against the wishes of the partner.  For example, in the event of a separation or divorce, embryos cannot be used to create a pregnancy without the express, written consent of both parties . . . ." *See supra* ¶ 6.

¶64        As the majority concedes, the Note at the outset of Section 10 states that neither party may use the embryos to create a pregnancy without the written consent of the other.  In interpreting Section 10(H), however, the majority incorrectly concludes in paragraph 43 that a court interpreting the

Agreement can disregard the Note and proceed to allocate the embryos according to a balancing test that is nowhere to be found in the Agreement. In other words, the majority concludes that when called upon to decide a question that the parties have addressed in the Agreement, the court is not governed by that Agreement.

¶65        But 10(H) does not say that. Instead, it recognizes that, in the case of a dissolution or separation, the Clinic can relinquish control of the embryos only upon receipt of a court order or agreement. It is no surprise that the form contract drafted by the Clinic would insulate the Clinic, for its own protection, from the obligation of having to act in the event of a disagreement between the parties. That is the meaning of the language in 10(H) that the parties checked, to the effect that a decree or settlement agreement "will be presented to the Clinic directing use to achieve a pregnancy in one of us or donation to another couple for that purpose." But nothing in the Agreement states that a court is free to disregard the other terms of the Agreement when it decides the question. Instead, 10(H) recognizes that, upon dissolution or separation, the court does what courts do: interpret the Agreement to decide the matter.

¶66        The majority concludes that because 10(H) refers to the specific situation of a dissolution or separation, it should "control" over the Note. But the Note itself specifically states that it applies in the event of separation or divorce: "For example, in the event of a separation or divorce, embryos cannot be used to create a pregnancy without the express, written consent of both parties . . . ." Under the Note, the court may not allocate the embryos to Torres because Terrell does not consent. Because the parties did not check the box to signify their agreement that the embryos could be destroyed, the only available option under the Agreement was donation to a third party. Instead, the majority's interpretation of Section 10 would render a part of the contract—the Note—meaningless. That is, "in the event of separation or divorce, embryos cannot be used to create a pregnancy **without the express, written** consent of both parties," is language wholly cast aside because the majority now has balanced the interests in favor of Torres. (Emphasis added.) *See Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 478, ¶ 56 (App. 2010) (stating the court should not construe one contractual term in a way that renders another meaningless) (citation omitted); *Gesina v. Gen. Elec. Co.*, 162 Ariz. 39, 45 (App. 1988) ("Each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing.") (citation omitted).

¶67      The two options available to the parties—(1) allow one of the two parties to use the embryos for pregnancy as to one of the parties, or (2)

donate them to another couple—are *consistent* with the parties' selections under additional sections of the Agreement, such as Sections A, B, D, and E. Those Sections of the Agreement anticipate and provide for other situations in which the Clinic would need to dispose of the embryos. Those are discontinuation of IVF treatment, nonpayment of storage fees, age-limited storage, death of a patient, and divorce or dissolution of the relationship of the parties. Most notably, Section H is the only circumstance of the five enumerated where the parties would be on opposing sides of a lawsuit. No other circumstance, not even the death of a party, requires a court order or settlement agreement for the Clinic to release the embryos. Logically, as discussed above, because of the potential for legal exposure, in divorce cases the Clinic requires the parties to produce either a court order or settlement agreement before it will release the embryos to either party. This requirement shields the Clinic from the risk of inadvertently releasing the embryos to the wrong party or releasing the embryos to a party who may use them to produce pregnancy against the wishes of the other partner, in clear violation of the terms of the Agreement. On the other hand, if the divorcing parties agree that one party may use the embryos for implantation, a court order need not be provided, so long as the settlement agreement displays the "contemporaneous permission" of the parties. This interpretation of the IVF Agreement gives effect to Sections A, B, D, E, and H without rendering any one of them meaningless.

¶68        Torres testified acknowledging the binding effect of the contract, admitting "we did sign a contract and we agreed to these provisions." Because the Agreement requires the contemporaneous permission of the other partner before one of them may use the embryos, when it states that "in the event of a separation or divorce, embryos cannot be used to create a pregnancy without the express, written consent of both parties," given that Terrell does not consent to the embryos being given to Torres, Section H's requirement directs the court to direct the Clinic to exercise the only remaining alternative: that the embryos be donated to another couple. Torres admitted she understood this to be the only alternative under the Agreement and that her request to have the embryos awarded to her was a request for relief outside the terms of the Agreement. Torres' own admission is telling:

> Q. What are you asking the court to order with regard to the embryos?
>
> A. I'm asking the court to order that they be awarded to me with use *or in the alternative to be donated just like the contract*. I want—you know, we both made this agreement

when we were okay. And I understand things didn't go the way we planned—or at least the way I planned, I'm not sure. *But we did sign a contract and we agreed to these provisions. We agreed to donate them.* Never did we select to destroy them.

(Emphasis added.)

¶69 Here, the majority, instead of construing the contract in a way that harmonizes all sections and is consistent with Torres' own understanding of their Agreement, interprets Section H to grant discretion to a court presiding over a dissolution "to make the disposition determination for the embryos in this case," without concern for other provisions of the parties' Agreement. *See supra* ¶42. The majority incorrectly concludes that Section 10(H) charges the court with deciding between awarding them to either party or donating them to another couple untethered to the constraints of the Agreement. Respectfully, I believe this conclusion is wholly unsupported. If the parties intended to grant a court the power to determine who should receive the embryos upon their divorce, unconstrained by the other terms of their Agreement, the IVF Agreement would have said so explicitly.

¶70 The IVF Agreement contains express language explicitly prohibiting the result the majority reaches today. Specific provisions in a contract are entitled to greater weight "because specific contract provisions express the parties' intent more precisely than general provisions." *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 291, ¶ 18 (App. 2010) (citing *Tech. Equities Corp. v. Coachman Real Estate Inv. Corp.*, 145 Ariz. 305, 306 (App. 1985), and *Cent. Hous. Inv. Corp. v. Fed. Nat'l Mortg. Ass'n*, 74 Ariz. 308, 311 (1952)); *see also Duenas v. Life Care Ctrs. of Am., Inc.*, 236 Ariz. 130, 140, ¶ 34 (App. 2014). The Agreement says that the "[e]mbryos cannot be used to produce pregnancy against the wishes of the partner. . . . without the *express, written* consent of both parties . . . ." (Emphasis added.) If the parties intended that in the event of a divorce a court should be the ultimate decisionmaker, their written agreement would state that the terms of the Agreement have no effect in the context of a divorce. Likewise, if Torres wanted to be permitted to use the embryos regardless of the Terrell's consent, she should have included such language in the Agreement or otherwise made plain that she did not agree to the requirement that his written consent would be required to make use of the embryos. By Torres' own testimony, we know Terrell was not her only sperm donor option. Torres' ex-boyfriend had previously agreed to donate his sperm. Whether that ex-boyfriend would have agreed to donate his sperm without

limitation on her use of the resulting embryos, or whether any sperm contribution by that ex-boyfriend would have generated embryos is speculative; but the terms of the contract for obtaining Terrell's sperm contribution were clear, agreed to by the parties and memorialized in a signed contract. Torres chose, despite having another donor option, to enter the Agreement and IVF process with Terrell.

¶71 Not only do I disagree with the majority's conclusion that the Agreement granted the court the power to decide the issue based not on the language of the Agreement but instead by balancing the parties' interests, I also disagree with the majority's decision to balance those interests itself. In so doing, the majority has not accorded due weight to the discretion of the superior court to consider the evidence and decide issues of credibility.

¶72 Because it is a legal question, we review *de novo* the trial court's choice of a legal principle to apply. *Pullen v. Pullen*, 223 Ariz. 293, 295, ¶ 9 (App. 2009). However, because the weight to which a factor is given is a factual question within the discretion of the trial court, the law requires that we review the court's weighing of factors in a balancing test for an abuse of discretion, giving appropriate deference to the trial court's ruling, and we will uphold the court's application of those factors if the court's decision is supported by sufficient evidence. *Id.* at 295-96, ¶ 9; *State v. Chapple*, 135 Ariz. 281, 297 n.18 (1983) ("Something is discretionary because it is based on an assessment of conflicting procedural, factual or equitable considerations which vary from case to case . . . . Where a decision is made on that basis, it is truly discretionary, and we will not substitute our judgment for that of the trial judge . . . .") (internal citations omitted).

¶73 Although we do not reweigh evidence on appeal, here the majority holds the trial court erred as a matter of law in its *application* of the balancing approach—in other words, it concludes the trial court correctly decided to undertake to balance the parties' respective interests but weighed them incorrectly. This is clear from the majority's listing of what the trial court did wrong: "The trial court erred by improperly concluding Torres' 'less than one percent' chance of becoming pregnant through normal means and the remote possibility of adoption or insemination with a donor embryo negated her claims to these embryos"; "the court gave insufficient weight to Torres' desire to have a biologically related child"; "the trial court erred when it placed heavy weight on the parties' inability to 'co-parent'"; the court improperly weighed Torres' decision to freeze embryos as opposed to just her eggs; and the court placed too much emphasis on its findings regarding the parties' marriage, calling the parties' actions "impulsive and expedient." *See supra* ¶¶ 47-50.

25

¶74    Under *Davis v. Davis*, the interests of the party wishing to avoid procreation should prevail in such a balancing, assuming the other party has a reasonable possibility of achieving parenthood by other means. 842 S.W.2d 588, 604 (Tenn. 1992). However, if no other reasonable alternatives exist, then the argument in favor of allowing the partner to use the pre-embryos to achieve pregnancy should be considered. *Id.* The lack of reasonable alternatives does not automatically require the court to award the embryos to the party seeking parenthood, but instead requires that it weigh that fact along with the other interests of the parties to resolve disposition of the embryos in a fair and responsible manner. *Id.* at 591.

¶75    Here, it is undisputed that when Torres signed the contract, she understood and agreed that she could not use the embryos without Terrell's permission. Nevertheless, balancing her interests to use the embryos against Terrell's desire not to have Torres use the embryos to achieve parentage, the trial court determined that Terrell's right not to be compelled to be a parent outweighed Torres' right to become a biological parent. Supporting its conclusion, the trial court found Terrell had an interest in choosing not to parent a biological child with Torres outside of marriage, would face a potentially significant financial responsibility of raising children, and that Torres waived her interest in procreating with the embryos created with Terrell's genetic contribution by signing the contract.[12]

¶76    The majority on one hand agrees with *Davis* and relies on it to support application of the balance of interests approach, but on the other ignores that *Davis* recognized "the right of procreational autonomy is composed of two rights of equal significance—the right to procreate and the right to avoid procreation." 842 S.W.2d at 601; *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or *beget* a child.") (emphasis added) (citation

---

[12]    To the extent the court's order was based on public policy, I agree with the majority that it may have been an improper consideration, though I agree that Terrell had an interest and right not to be forced to procreate with Torres if he did not wish to do so. As the court found, Terrell testified he did not intend to have children with Torres if they were not together, and neither Torres nor Terrell presented evidence they discussed having children together if the relationship ended, nor did they execute any further agreements saying otherwise.

omitted). "The equivalence of and inherent tension between these two interests are nowhere more evident than in the context of *in vitro* fertilization." *Davis*, 842 S.W.2d at 601. While crediting Torres' interest (right) in biological procreation and the difficulty she would otherwise encounter if not granted the embryos, the majority disregards Terrell's interest (right) in not having biological children, though they both equally extend from the same right of procreational autonomy—a "*right* to procreate" and a "*right* to avoid procreation." *See id.* at 601, 603 (emphasis added); discussion *supra* Section II.B. Although the majority correctly notes this case does not present the same type of government intrusion on the parties' personal decisions regarding reproduction, *see supra* ¶¶ 53-54, it errs by separating the parties' rights from the interests protected by those rights.

¶77 Moreover, the trial court did not improperly discount Torres' interest in having children. The court considered Torres' "strong interest in having a biological child," and acknowledged "the evidence supports that it would be almost impossible for [Torres] to become pregnant through normal means of pregnancy and through the use of any existing egg." On the other hand, the court noted Torres could achieve parenthood by other means.

¶78 The majority concludes "[t]he trial court overstated Torres' ability to become a parent through means other than the use of the disputed embryos." *See supra* ¶ 48. In support of this proposition, the majority relies on Dr. Behera's testimony that "embryo donation involved being placed on a long waiting list," and on Torres' testimony that she has thought of adoption but her medical history makes it unlikely that she would be given the opportunity to adopt a child. But the court heard no evidence, other than Torres' speculation, regarding her perceived inability to adopt children. To be sure, Dr. Behera offered no testimony regarding the likelihood that Torres could achieve parenthood through adoption.

¶79 In *Davis*, the court concluded that "if [the wife] were unable to undergo another round of IVF, or opted not to try, she could still achieve the child-rearing aspects of parenthood through adoption." 842 S.W.2d at 604. While Torres asserts her desire to have biological children—an interest entitled to some weight—the trial court found she can still adopt or seek donation of other embryos, even if those avenues were more difficult. Arizona law treats biological children and adopted children the same. A.R.S. § 8-117 ("On entry of the decree of adoption, the relationship of parent and child and all the legal rights, privileges, duties, obligations and other legal consequences of the natural relationship of child and parent

thereafter exist . . . as though the adopted child were born to the adoptive parent in lawful wedlock."). Torres may have a higher interest in biological children and the trial court may give weight to her interest, but I am wary of a judicial determination that a greater weight to biological parenthood exists over adoptive.[13] Furthermore, any medical concerns regarding her ability to adopt a child or to raise adoptive children are similarly present during pregnancy and biological child-rearing. And Torres was medically cleared by her oncologist to become pregnant through IVF. Arguably, if Torres' medical history does not prevent her from achieving parenthood through implantation, it should not act as a bar to adoption either. To conclude Torres is likely unable to become a parent through adoption is to step outside out role and reweigh the credibility of Torres' self-serving testimony. The trial court saw and heard Torres testify. As such, the court was free to take all positions, significance of interests, and burdens into account when making credibility determinations and resolving the conflicting interests of the parties, including those of her prospective children if Torres suffers future medical hardship. *Davis*, 842 S.W.2d at 603. Therefore, the trial court gave proper consideration to Torres' ability to become a parent through adoption.

¶80 Also, while it is true that the possibility of a child support obligation existed when Terrell signed the IVF agreement, the terms of the Agreement protected him, in the event of a separation or divorce, from incurring that financial responsibility without his express written consent. Moreover, a father's involvement with children may extend beyond simple financial support, to the raising and caring for children in every way contemplated by society, just as the mother's involvement extends beyond maternal care to financial support. The majority's ruling also ignores Terrell's position that, given Torres' connection to Terrell's family and friends, there exists a high likelihood that any children, potentially seven or more of them, born of the embryos would be known to Terrell's family and friends, forcing him to choose between accepting parenthood or crassly and openly avoiding it. The trial court properly weighed these factors.

¶81 Notwithstanding the contract, the trial court balanced the competing interest of the parties. Still, consistent with the parties' contractual Agreement, the court awarded the embryos to the IVF center to

---

[13] *Contra Reber v. Reiss*, 42 A.3d 1131, 1139 (Pa. Super. Ct. 2012) ("There is no question that the ability to have a biological child and/or be pregnant is a distinct experience from adoption. Thus, simply because adoption or foster parenting may be available to Wife, it does not mean that such options should be given equal weight in a balancing test.").

allow another couple to bring them to life. The majority reweighs the evidence to reach a different result. For the foregoing reasons, I dissent from the majority opinion vacating the trial court's order and directing the trial court to award Torres the embryos based on the majority's own re-weighing of the parties' interests.

¶82 I further dissent as to the form of relief granted. If we conclude the court erred as a matter of law when it improperly weighed Torres' interests, then, rather than putting ourselves in the position of fact-finder by weighing the interests of the parties, we should remand this matter to the trial court for a proper weighing of the interests. *See, e.g.*, *Owen v. Blackhawk*, 206 Ariz. 418, 423, ¶¶ 22-23 (App. 2013) (remanding upon finding the trial court failed to properly consider father's engagement and certain related evidence, with instructions to the trial court to give such evidence "full consideration"). It is not our role as an appellate court to invade the factual province of the superior court and balance the interests of the parties ourselves.

¶83 Do contracts matter? I believe they do. Therefore, because the contract of these parties explicitly prohibits the outcome reached by the majority, and because it is outside our purview to reweigh the evidence, I would affirm the trial court's judgment, or, in the alternative, remand the matter to the trial court for a new weighing of the parties' interests.

