IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**IN RE THE MATTER OF:**

**JOHN JOSEPH TERRELL**,
*Petitioner/Appellee,*

*v.*

**RUBY TORRES**,
*Respondent/Appellant.*

---

No. CV-19-0106-PR
Filed January 23, 2020
Amended per order filed February 21, 2020

---

Appeal from the Superior Court in Maricopa County
The Honorable Ronee F. Korbin Steiner, Judge
No. FN2016-001785
**AFFIRMED**

---

Opinion of the Court of Appeals, Division One
246 Ariz. 312 (App. 2019)
**VACATED IN PART**

---

COUNSEL:

Eric M. Fraser (argued), Hayleigh S. Crawford, Osborn Maledon, P.A., Phoenix; Claudia D. Work, Campbell Law Group, PLLC, Phoenix, Attorneys for John Joseph Terrell

Stanley D. Murray (argued), Stanley David Murray Attorney at Law, Scottsdale, Attorney for Ruby Torres

—————————

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which JUSTICES BOLICK, GOULD, LOPEZ, and MONTGOMERY joined.[*]

—————————

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        Ruby Torres and John Terrell entered an agreement directing the disposition of cryopreserved embryos should the couple divorce.  We here decide whether the parties' agreement granted the family court discretion in awarding the embryos or whether it directed that disposition.  We conclude the agreement directed donation of the embryos to another couple.

## BACKGROUND

¶2        In June 2014, thirty-three-year-old Torres was diagnosed with cancer, requiring treatment that could cause infertility.  Before undergoing treatment, Torres decided to enhance her chances of later having a biological child by using her eggs and a donor's sperm to create embryos and then cryopreserving (freezing) those embryos for later implantation through in vitro fertilization ("IVF").  Torres asked her then-boyfriend, Terrell, to serve as the sperm donor and, after initially declining, he agreed.

¶3        In July, Torres and Terrell signed a series of pre-printed joint consent forms required by Fertility Treatment Center ("FTC") before it would perform IVF-related services.  At issue here is the form entitled "Embryo Cryopreservation & Embryo Disposition" ("the Agreement"), wherein FTC agreed to store any embryos for up to ten years.  The Agreement established that any embryos would be the couple's joint property and, as such, joint consent would be required for their use or disposition.  Torres and Terrell agree that the Agreement governs any dispute between them concerning disposition of the embryos.

¶4        Although the Agreement acknowledged that the disposition of cryopreserved embryos was "a rapidly evolving field, both medically

—————————

[*]        Chief Justice Robert Brutinel and Justice James P. Beene have recused themselves from this matter.

and legally," paragraph 10 described three alternate dispositions in the event the couple separated, divorced, died, or became incapacitated: (1) discard the embryos, (2) donate the embryos to another couple, or (3) allow one partner to use the embryos with the contemporaneous permission of the other. A "note" warned that any embryos produced could not be used to produce a pregnancy over the other partner's objection and stated that in the event of a divorce, both parties would have to give "express, written consent" before one could use the embryos to achieve a pregnancy.

¶5          Paragraph 10 ultimately asked the parties to indicate joint disposition choices under different scenarios by checking boxes and initialing those choices. Significantly, in the event of divorce or dissolution of their relationship, Torres and Terrell checked and initialed the first provided option in paragraph 10(H):

> Divorce or Dissolution of Relationship. In the event the patient and her spouse are divorced or the patient and her partner dissolve their relationship, we agree that the embryos should be disposed of in the following manner (check one box only):
> [x] A court decree and/or settlement agreement will be presented to the Clinic directing use to achieve a pregnancy in one of us or donation to another couple for that purpose.
> [ ] Destroy the embryos.

The Agreement also provided that either or both parties could change their disposition selections "at any future time, or until the embryo(s) are disposed" by providing written notice to FTC and entering into a new contract.

¶6          Four days after signing the Agreement, Torres and Terrell married. The parties then underwent IVF procedures, which produced seven viable embryos that FTC cryogenically preserved and stored. Shortly thereafter, Torres underwent chemotherapy, which caused "a significant drop in her reproductive function."

¶7          Terrell initiated this matter by petitioning for divorce in 2017. The dispute here concerns the proper disposition of the embryos. Torres wants the embryos for future implantation, and Terrell, who does not wish

to father any future children with Torres, asks that they be donated to another couple.

**¶8**        Following an evidentiary hearing, the family court found that paragraph 10(H) of the Agreement foreclosed destruction of the embryos but did not resolve whether either Torres or Terrell should get the embryos or whether they should be donated.  Consequently, the court balanced the parties' interests to make that decision and concluded, "[Terrell's] right not to be compelled to be a parent outweighs [Torres's] right to procreate and desire to have a biologically related child."  *See Davis v. Davis*, 842 S.W.2d 588, 603–04 (Tenn. 1992) (describing the balancing-of-interests approach).  It therefore directed FTC to donate the embryos to another couple.

**¶9**        In a divided opinion, the court of appeals vacated the family court's disposition of the embryos and directed the court to award them to Torres.  *Terrell v. Torres*, 246 Ariz. 312, 325 ¶ 61 (App. 2019).  The majority interpreted paragraph 10(H) as providing the parties' consent for a court to use its discretion to either award the embryos to one party or direct their donation.  *See id.* at 321 ¶ 39.  It agreed with the family court that a court should balance the parties' interests to make the disposition decision.  *See id.* at 322 ¶ 43.  But it concluded the family court here improperly balanced the parties' interests and erred as a matter of law by not awarding the embryos to Torres.  *See id.* at 322–25 ¶¶ 43–56.

**¶10**        The dissent disagreed that paragraph 10(H) granted the court authority to dispose of the embryos by balancing the parties' interests rather than as dictated by the Agreement.  *See id.* at 326 ¶¶ 64–65 (Cruz, J., dissenting).  Interpreting the Agreement, the dissent found the embryos must be donated.  *See id.* ¶ 66.  Alternatively, the dissent concluded the majority failed to accord due weight to the family court's discretion in balancing the parties' interests.  *See id.* at 328 ¶ 71.

**¶11**        We granted review because this case involves unique issues of statewide importance.

## DISCUSSION

**¶12**        Neither party contests that the family court must enforce a contract between a couple that directs the disposition of embryos in the event of divorce.  Subject to defenses prescribed by contract law, we agree.

Our courts have traditionally enforced contracts between divorcing couples regarding the disposition of property.[2]  *See* A.R.S. § 25-317(A)–(B) (providing that parties may enter into written separation agreements directing property dispositions and that courts must generally enforce those agreements).  Similarly, other state courts addressing the disposition of embryos in dissolution proceedings have looked first to any existing contracts.  *See, e.g.*, *J.B. v. M.B.*, 783 A.2d 707, 719 (N.J. 2001); *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998); *Davis*, 842 S.W.2d at 597; *Litowitz v. Litowitz*, 48 P.3d 261, 267–68 (Wash. 2002).  We agree that agreements between couples regarding the disposition of their embryos "should generally be presumed valid and binding, and enforced in any dispute between them." *Kass*, 696 N.E.2d at 180.

**¶13**     The dispute here is whether paragraph 10(H) of the Agreement leaves the dispositional choice to the courts' discretion, as Torres argues and the lower courts concluded, or whether the Agreement requires donation of the embryos, as Terrell asserts and the court of appeals dissent found.  We review the interpretation of the Agreement de novo as an issue of law.  *See Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003).

**¶14**     Despite the Agreement's sensitive subject matter, we apply ordinary interpretive principles to arrive at its meaning.  *See Kass*, 696 N.E.2d at 180 ("The subject of this dispute may be novel but the common-law principles governing contract interpretation are not.").  When interpreting a contract, we seek to discover and effectuate the parties' expressed intent.  *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152 (1993).  To do so, we construe the provisions "according to their plain and ordinary meaning," *First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 350 ¶ 8 (2016), unless it can be shown that the parties intended a special meaning, *Taylor*, 175 Ariz. at 153.  In doing so, we consider a provision's meaning in the context of the entire contract.  *See Climate Control, Inc. v. Hill*, 86 Ariz. 180, 188 (1959) ("A clause in a contract, if taken by itself, often admits of two meanings, when from the whole contract there is no reasonable doubt as to the sense in which the parties use it.").  Finally, we

---

[2] Since the family court's ruling here, the legislature enacted A.R.S. § 25-318.03, which directs the disposition of embryos in marriage dissolution proceedings regardless of any contract.  *See* 2018 Ariz. Sess. Laws ch.128, § 1.  That statute does not state that it applies retroactively, and we do not consider it further.  *See* A.R.S. § 1-244 ("No statute is retroactive unless expressly declared therein.").

attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous. *See Taylor*, 175 Ariz. at 158 n.9.

¶15          We start with paragraph 10(H), which sets forth the parties' joint dispositional choice in the event of divorce or dissolution of the relationship. The parties clearly did not choose to destroy the embryos because they did not check the box indicating that choice. *See supra* ¶ 5. That leaves two options, both of which are the subject of the checked box: "A court decree and/or settlement agreement will be presented to [FTC] directing use to achieve a pregnancy in one of us or donation to another couple for that purpose." *See id.*

¶16          Read in isolation, paragraph 10(H) does not reveal how a court would choose between the options if the parties were unable to agree on the disposition of the embryos. But when read in context, we agree with Terrell that paragraph 10(H) means that upon divorce or dissolution of the relationship, the parties chose to donate the embryos absent a contemporaneous agreement for use by one of them.

¶17          Before listing dispositional choices under different scenarios, paragraph 10 advised the parties that three choices existed in the event of separation, divorce, death or incapacitation:

> 1.     Discarding the cryopreserved embryo(s)
>
> 2.     Donating the cryopreserved embryo(s) to another couple in order to attempt pregnancy. (In this case, you may be required to undergo additional infectious disease testing and screening due to Federal or State requirements. This will require contemporaneous permission of both living partners unless otherwise specified by a court decree and/or settlement agreement in the event of divorce or dissolution of the relationship.)
>
> 3.  Use by one partner with the contemporaneous permission of the other for that use.

Significantly, a "note" in paragraph 10 warned that "[e]mbryos cannot be used to produce pregnancy against the wishes of the partner. For example, in the event of a separation or divorce, embryos cannot be used to create a

pregnancy without the express, written consent of both parties, even if donor gametes were used to create the embryos."

¶18 Against this backdrop, paragraph 10(H) instructs FTC how to proceed in the event of a divorce or dissolution of the relationship. Notably, the checked selection does not reflect a final dispositional choice but rather narrows the choices and obligates the parties to present FTC with a court decree or settlement agreement directing unilateral use or donation of the embryos. The provision does not modify or negate the requirement for express, contemporaneous consent by the parties for a unilateral award of the embryos to produce pregnancy. Nor does it grant the family court discretion to make either a unilateral award or direct donation. Instead, assuming the parties could not produce a settlement agreement, as occurred here, it requires them to procure a court decree directing FTC in the disposition.

¶19 We agree with the court of appeals' dissent that this requirement is hardly surprising as FTC would have reasonably required either an agreement or a court order to direct disposition of the embryos, thereby insulating itself from liability, in the face of the parties' break-up and potentially conflicting instructions. *See Terrell*, 246 Ariz. at 326 ¶ 65 (Cruz, J., dissenting). This is especially so as the Agreement permits the parties to unilaterally change their dispositional choices until FTC disposes of the embryos.

¶20 Because the parties did not produce a settlement agreement directing disposition of the embryos, paragraph 10(H) required the family court to examine the Agreement to determine the parties' dispositional choice or, if one was not made, award the embryos employing common law principles. *See Kass*, 696 N.E.2d at 180. Because paragraph 10 unambiguously requires one party's express, contemporaneous permission before the other can use the embryos to achieve a pregnancy after divorce, the family court could not award the embryos to one party against the other's wishes. Here, Terrell objected to awarding the embryos to Torres to produce a pregnancy. Thus, the only choice available to the family court under paragraph 10(H) was donation of the embryos, which did not require contemporaneous consent of the parties. *See* Agreement ¶ 10(2).

¶21 The court of appeals reached a different conclusion, interpreting the checked box in paragraph 10(H) as authorizing the family court to balance the parties' interests to either award the embryos to one

party or direct their donation to another couple. *See Terrell*, 246 Ariz. at 321 ¶ 39. The court of appeals viewed the checked box as the parties' "express, written consent" to unilateral use of the embryos by either party, thus complying with paragraph 10's "consent" requirement. *See id.* For several reasons, we disagree.

**¶22** First, the checked box in paragraph 10(H) did not state that one party would be awarded the embryos in the event of divorce or dissolution of the relationship. Conversely, other subparts of paragraph 10 reflect the parties' consent to unilateral awards. In paragraph 10(A), the parties explicitly consented to awarding the embryos to Torres if the couple discontinued IVF treatment. Similarly, the parties consented to awarding the embryos to a named person in the event of Torres's death (paragraph 10(E)) or Terrell's death (paragraph 10(F)). If the parties had intended paragraph 10(H) to constitute "express, written consent" to a unilateral award, we would expect similar specificity. Also, paragraph 10(H)'s inclusion of donation as an option in the checked box further undermines a conclusion that the parties jointly consented to a unilateral award by checking the box. In short, consent to producing a settlement agreement or court decree directing a unilateral award or donation is not express, written consent for use by one party to produce pregnancy.

**¶23** Second, if the checked box in paragraph 10(H) constituted consent for the family court to award the embryos to one party over the other's objection, the note's requirement for express, written consent by both parties for a unilateral award in the event of separation or divorce would be meaningless. *See Taylor*, 175 Ariz. at 158 n.9. In other words, if checking the box in paragraph 10(H) provided consent to a unilateral award, there was no need to include a note separately requiring such consent. Interpreting the checked box as requiring donation if the parties were unable to agree on a unilateral award at the time of separation or divorce gives meaning to both paragraph 10(H) and the note.

**¶24** Third, the court of appeals ignores the requirement that permission for one party's use of the embryos be "contemporaneous" with that use. *See* Agreement ¶ 10(3). Unlike the contemporaneous permission required if infectious disease testing and screening is needed to donate embryos, the Agreement does not permit a court decree to negate the contemporaneous permission required for a unilateral award. *See* Agreement ¶¶ 10(2)–10(3). But interpreting the checked box in paragraph 10(H) as providing consent to the other partner's future use of the embryos

in advance of divorce or dissolution of the relationship negates the contemporaneousness requirement.

¶25        We are cognizant of the unavoidable emotional fall-out attendant to the disposition of the embryos here.  But the family court was required to enforce the parties' chosen disposition of the embryos as set forth in the Agreement.  *Cf. Kass*, 696 N.E.2d at 180 (encouraging advance directives before parties embark on IVF and cryopreservation "to think through possible contingencies" and to "minimize misunderstanding and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision").  The parties checked a box in paragraph 10(H) that left open the option of one party using the embryos if both agreed at the time their relationship ended and directed donation of the embryos if an agreement could not be reached.  Because the parties did not agree to a unilateral award, the court could only direct donation of the embryos.  The court of appeals erred by deciding otherwise.  Although the family court likewise erred by balancing the parties' interests rather than enforcing the Agreement, it correctly directed donation of the embryos.  In light of our decision, we need not decide whether the family court should balance parties' interests if they do not have a contract governing the disposition of embryos or whether the court of appeals here correctly balanced the parties' interests.

## CONCLUSION

¶26        We vacate the court of appeals' opinion, except paragraphs 57–60, and affirm the family court's order directing donation of the embryos.