NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

MELANIE LANE, *Plaintiff/Appellee,*

*v.*

STATESMAN SALES & MARKETING LLC, *Defendant/Appellant.*

No. 1 CA-CV 20-0396

---

Appeal from the Superior Court in Maricopa County
No. CV2017-006304
The Honorable Daniel J. Kiley, Judge

**AFFIRMED IN PART; REVERSED IN PART; VACATED AND
REMANDED IN PART**

---

COUNSEL

Simmons & Gottfried PLLC, Scottsdale
By Jared C. Simmons
*Counsel for Defendant/Appellant*

Joshua Carden Law Firm PC, Scottsdale
By Joshua W. Carden
*Counsel for Plaintiff/Appellee*

_____

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge David B. Gass and Judge David D. Weinzweig joined.

_____

**B R O W N**, Judge:

¶1   Statesman Sales & Marketing, LLC ("Statesman") appeals the superior court's judgment in favor of its former employee, Melanie Lane, awarding her unpaid sales commissions and incentives, treble damages, attorneys' fees, and costs. We affirm a portion of the damages award ($1,331.12) relating to the commission Lane earned on the sale of Unit 437. We vacate the court's awards of attorneys' fees and costs, and remand for reconsideration of those awards. We reverse the remainder of the judgment.

**BACKGROUND**

¶2   Statesman markets and sells real estate. In March 2016, Statesman hired Lane as a real estate agent to sell new condominiums in its Chandler community. The parties entered into an At-Will Employment Agreement ("Agreement") under which Statesman would pay Lane a commission of 1.50 percent of the total purchase price for each condominium sold as set forth in Schedule A, which provided in part:

> *One Commission ONLY is paid per unit at 50% upon <u>executed</u> Purchase Contract without any conditions provided that all NON-REFUNDABLE earnest money deposits are paid and an approved loan pre-qualification letter is submitted with the Purchase Contract. Cash buyers require Verification of Funds. 50% is paid upon closing of the Unit (transfer of title).*

We refer to the first 50% commission, paid on receipt of an executed purchase contract, as the "First Half Commission" and the second 50% commission, paid at closing, as the "Second Half Commission."

¶3   At the time Statesman terminated Lane, she had sold nine condominiums that were still pending; all but one eventually closed escrow. Statesman claimed it was not obligated to pay Lane the Second Half Commission for those closings under the first sentence of § X(2) of the Agreement, which states: "The Sales Professional will forfeit as liquidated

damages any and all monies of the Standard Fee Commission as outlined in Section I of this Agreement should he/she no longer remain employed with [Statesman] at the closing/occupancy date of a unit."

¶4       Lane sued Statesman in June 2017, alleging breach of contract, violation of the Arizona Wage Act, unjust enrichment, and breach of the duty of good faith and fair dealing, based in part on Statesman's refusal to pay the Second Half Commission on the units that closed after her termination date. Statesman denied liability and counterclaimed for breach of contract and unjust enrichment due in part to Lane's alleged refusal to repay the draws advanced against her unearned commissions.

¶5       Lane moved for partial summary judgment, asserting Statesman breached the Agreement and that § X(2) was void because it unlawfully imposed liquidated damages as a penalty in the absence of any breach on her part. The superior court granted the motion in part, finding that the "liquidated damages" provision in the first sentence of § X(2) was "void as an unenforceable penalty," and Statesman could not withhold compensation based on that provision.

¶6       At trial, Statesman argued Lane was not entitled to the Second Half Commissions based on § 9.3 of the Agreement, which provides that Statesman's "obligations to the Employee under this Agreement shall terminate except obligations to pay the Employee's Compensation through the termination date." Having held § X(2) unenforceable, the court found § 9.3 was identical and also unenforceable. The court heard evidence regarding the parties' interpretation of the Agreement and concluded that Lane was entitled to the full commission on each unit she sold if it eventually closed, even if closing occurred after her termination date.

¶7       The court trebled the damages under the Arizona Wage Act, A.R.S. § 23-355, finding Statesman lacked a reasonable justification for not paying the Second Half Commissions. The court's judgment awarded Lane $42,291.64 in damages, $22,838.52 in attorneys' fees, and $2,623.62 in costs. The court denied Statesman's motion for new trial and awarded Lane $1,680 in additional attorneys' fees and $6.70 in costs. Statesman timely appealed, and we have jurisdiction under A.R.S. § 12-2101(A)(1).

**DISCUSSION**

¶8       The interpretation of a contact involves questions of law that we review de novo. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003). When interpreting a contract, we attempt to "give effect to the intention of the parties," *Taylor v. State Farm Mut. Auto Ins. Co.*, 175 Ariz. 148, 153 (1993)

citation omitted), and we construe provisions "'according to their plain and ordinary meaning' . . . unless it can be shown that the parties intended a special meaning," *Terrell v. Torres*, 248 Ariz. 47, 50, ¶ 14 (2020) (citations omitted). "[W]e consider a provision's meaning in the context of the entire contract . . . [and] attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous." *Id.* (citations omitted). "[A]fter consideration of the parties' intentions," the provisions must "be construed against the drafter." *MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 219 Ariz. 297, 302, ¶ 10 (App. 2008).

¶9　　　　When extrinsic evidence is offered to aid in interpreting the contract, we first "consider[] the offered evidence and, if [we] find[] that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor*, 175 Ariz. at 154. Whether the contract language is "reasonably susceptible" to multiple interpretations is a question of law for the court. *Id.* at 158–59.

　　　　A.　**Second Half Commissions**

¶10　　　　The superior court found that Statesman could not rely on §§ X(2) or 9.3 of the Agreement to deny Lane payment for Second Half Commissions because those provisions were unenforceable penalties. The court held that § X(2) was unenforceable, and then concluded § 9.3 was also unenforceable as "identical-in-scope-and-effect" to § X(2). The court ultimately determined that although Statesman had a valid reason to terminate Lane, she was entitled to the full 1.50% commission on every unit she sold that eventually closed escrow. We disagree, however, with the court's reasoning because under § 9.3 Lane was not entitled to Second Half Commissions. Thus, we need not address the validity or enforceability of § X(2).

¶11　　　　The court determined that § 9.3 is inconsistent with § 4.1, because § 4.1 incorporates Schedule A, which does not contain a valid "commission forfeiture" provision. Schedule A sets forth what the employee's commission is (1.50% of the total purchase price) and when it is paid (half upon a signed contract and half upon closing). Section 9.3, on the other hand, describes what compensation is owed when an employee is terminated. Because these two provisions address different issues, we must give legal effect to each of them. *See Terrell*, 248 Ariz. at 50, ¶ 14.

¶12　　　　Next, the court rejected Statesman's argument that Lane had no reasonable expectation to receive Second Half Commissions because

other salespeople had to perform her duties that continued up to and including closing. The court explained that nothing in Schedule A makes entitlement to commissions on post-sale, pre-closing tasks. Instead, the court reasoned that Schedule A only conditions the earning of commissions on (1) a signed purchase contract, (2) payment of a non-refundable deposit, and (3) closing of the unit and transfer of title. The court erred, however, because Schedule A explains when the commissions are *paid*, not when they are *earned*. Indeed, nothing in the Agreement explicitly states when commissions are *earned*.

¶13 Even without explicit language, the Agreement as a whole plainly requires salespeople to perform additional duties to close the sale after the contract is signed. *See Terrell*, 248 Ariz. at 50, ¶ 14. It lists several post-sale responsibilities expected of Statesman employees, including: (1) maintaining records "for each transaction from the date of sale to the close[;]" (2) managing "buyers' expectations and experience throughout the home-buying process, including design center, mortgage, inspection, settlement, and move-in[;]" and (3) "[s]ell and close Statesman product offerings." *See* Agreement at § III(d), (l), (u). In addition, the sales operations team is instructed to support sales associates like Lane with "customer management and closing assistance." *Id*. at § IV(g). Thus, the Agreement required Lane to perform additional duties after she completed the initial sale of a condo to ensure the unit successfully closed. *See also Thermo-Kinetic Corp. v. Oliver*, 22 Ariz. App. 109, 110–11 (1974) (addressing a similar commission provision, and holding the scheme "contemplated the performance of additional duties by the salesmen to close the transaction").

¶14 Within Schedule A of the Agreement, § I(B) states the 1.50% commission is paid equally to all salespeople, while § X(4) explains that all salespeople who start working after a sale has been executed will receive a "percentage of the . . . Commission on the existing Units sold based on the remaining amount of work to be performed." Although these two provisions contain conflicting methods of allocating the commission, they show the salespeople share the "one commission" to some degree. In addition, these provisions evidence the parties' intent that salespeople are expected to perform additional duties after the initial sale and support the conclusion that the sales process does not end upon the receipt of a signed contract and earnest money.

¶15 At trial, the parties presented conflicting evidence as to Statesman's practices. Lane and another salesperson, Polly Blackwell, testified that salespeople were not expected to perform post-sale duties, which were handled by a closing coordinator. However, Blackwell asked

for and received at least a portion of the Second Half Commissions on Lane's sales because she spent significant time on post-sale closing duties for those units after Lane left, as Blackwell explained in a letter to Statesman's president Alana Mann. Mann testified the closing process was handled as a team, and Statesman paid Second Half Commissions to the people who continued to do work up to the closing. According to Mann, this is standard practice in the industry.

¶16   Reading the contract as a whole, § 9.3 reflects the parties' intent that salespeople must perform additional duties before closing, and the two-part commission structure in Schedule A is consistent with that intent. This structure prevents Statesman from incurring losses from having to pay two salespeople for work that only one actually performs. By retaining Second Half Commissions after a salesperson is terminated, Statesman is able to pay that commission to the salesperson who actually performs the work necessary to close the sale.

¶17   Because Lane was not entitled to the Second Half Commissions, Statesman's refusal to pay was not unreasonable and does not warrant treble damages under A.R.S § 23-355(A). *See Apache E., Inc. v. Wiegand*, 119 Ariz. 308, 312–13 (App. 1978) (finding treble damages only apply to unreasonable or bad-faith wage disputes). Therefore, we vacate the $34,692.39 award.

## B.  **Additional Damages**

¶18   In addition to the treble damages for unpaid Second Half Commissions, the superior court also awarded damages for the amount Statesman mistakenly underpaid Lane for the full commission and sales incentive on Unit 437. The total commission on Unit 437 was $5,324, so the First Half Commission should have been $2,662. Statesman only paid Lane $1,330.88. Statesman contends Lane was not entitled to any of the First Half Commission or sales incentive for Unit 437 because it was paid to another salesperson, Julie Antunes. The record does not support this claim.

¶19   At trial, Statesman did not conclusively show that another salesperson wrote the contract on Unit 437. Statesman's motion for new trial included a spreadsheet showing that it paid Antunes 50% of the First Half Commission ($1,330.88) but no sales incentives for Unit 437. Statesman did not offer this spreadsheet at trial, even though it apparently generated this document in 2016. Thus, the court did not abuse its discretion by refusing to consider this new evidence under Arizona Rule of Civil Procedure 59(a)(1)(D). *See Boatman v. Samaritan Health Servs., Inc.*, 168 Ariz.

207, 212 (App. 1990) (upholding denial of motion for new trial when newly discovered evidence was known to the offering party and thus could have been discovered before trial with due diligence).

**¶20**　　　The record supports the court's decision to compensate Lane for the entire First Half Commission on Unit 437. The court found no basis to treble this award. As explained above, Lane was not entitled to any Second Half Commissions. Thus, we affirm the judgment for the remaining First Half Commission on Unit 437, as modified, resulting in an award of $1,331.12.

**¶21**　　　The damages award also included a $2,450 sales incentive for Unit 437, which the court trebled to $7,350. The court found Statesman awarded the sales incentive to Lane in a March 30, 2016 email from Mann and could not rescind a previously-awarded bonus. In contrast, the court found that Lane was not entitled to sales incentives for other units she sold that had not closed by her termination date because Statesman might have had to use the incentives to induce the buyers to close, even after signing a contract. Although the email offering the sales incentive was dated March 30, 2016, it plainly stated that the incentive was payable at *closing*. In light of § 9.3, Lane had no reasonable expectation she would be paid for a sales incentive payable at closing if she were terminated before the closing date based on this email. We vacate the $7,350 award.

### C.　　**Attorneys' Fees and Costs**

**¶22**　　　Following the trial, the superior court awarded Lane a portion of her attorneys' fees under A.R.S. § 12–341.01, plus taxable costs. After denying Statesman's motion for new trial, the court awarded additional attorneys' fees and costs. Given our disposition of this appeal, we vacate each of those awards and remand for reconsideration of the parties' competing requests for attorneys' fees and taxable costs. *See Lee v. ING Inv. Mgmt., LLC*, 240 Ariz. 158, 161, ¶ 8 (App. 2016) (explaining the determination of "successful party" under § 12–341.01 is within the trial court's discretion, which will not be disturbed if any reasonable support exists); *Assyia v. State Farm Mut. Auto. Ins. Co.*, 229 Ariz. 216, 223, ¶ 32 (App. 2012) (noting the trial court's discretion to determine who is a successful party for awarding costs under § 12–341, which mandates an award to such party).

**¶23**　　　In our discretion, we deny both parties' requests for attorneys' fees incurred on appeal under § 12-341.01. We award Statesman taxable costs upon compliance with ARCAP 21.

**CONCLUSION**

**¶24** We affirm the superior court's award relating to Unit 437, as modified herein. We vacate the court's awards of attorneys' fees and costs and remand for reconsideration. We reverse all other portions of the judgment.