NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

In re the Marriage of:

MEGAN KATHLEEN MAYHALL, *Petitioner/Appellee,*

*v.*

JEFFREY STEPHEN MAYHALL, *Respondent/Appellant.*

No. 1 CA-CV 23-0623 FC

FILED 08-13-2024

Appeal from the Superior Court in Maricopa County
No. FC2022-003712
The Honorable James N. Drake, Judge

**AFFIRMED**

COUNSEL

Tiffany & Bosco, P.A, Phoenix
By Amy D. Sells
*Counsel for Petitioner/Appellee*

Hoffman Legal, LLC, Phoenix
By Amy Wilkins Hoffman
*Co-Counsel for Respondent/Appellant*

Burt Feldman Grenier, Scottdale
By Sandra Burt, Ashley Ponzo
*Co-Counsel for Respondent/Appellant*

### MEMORANDUM DECISION

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Brian Y. Furuya and Judge David D. Weinzweig joined.

**M O R S E**, Judge:

**¶1**     Jeffrey Mayhall appeals from the decree of dissolution in which the superior court found that a parcel of real property acquired during the marriage was community property. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

**¶2**     Jeffrey Mayhall ("Husband") and Megan Mayhall ("Wife") married in 2013. Prior to the marriage, the Mayhalls signed a prenuptial agreement (the "Agreement").

**¶3**     At the time of the Agreement, Husband owned a house at 1943 Goldfinch Way ("Goldfinch") in Chandler. In paragraph 8 of the Agreement, titled "JEFFREY'S RESIDENCE," the Agreement determined that "[t]his residence [Goldfinch], and any replacement residence or the purchase of any second or vacation homes, is now and shall remain the sole and separate property of [Husband]." The Agreement included ten recitals, which the parties expressly incorporated into the Agreement. In paragraph H of the Agreement's recitals, the parties noted they intended for "their separate property . . . *and acquisitions there from* [sic] to always and forever remain their separate property." (Emphasis added.) The parties also stated their intent to characterize "each party's . . . acquisitions after marriage to be the sole and separate property of the one *so earning and acquiring*." (Emphasis added.)

**¶4**     As applied to "[Husband's] residence," the Agreement disclaimed any legal or equitable interest in favor of Wife or the marital community on the basis of mortgage payments, "even if title to the property is taken in the parties' joint names or in community property," unless certain conditions occurred. Specifically, Wife could claim an interest in the residence only if the Mayhalls titled the residence in a form of joint property and either Husband died before an operative event (such as divorce) or the

Mayhalls "executed a separate written agreement, pursuant to paragraph 11, defining each party's interest in the residence, separate from the deed."

**¶5**   In paragraph 11, the Agreement permitted the Mayhalls to acquire property jointly, "[n]otwithstanding any other provisions of this Agreement," if they "execute[d] a separate written agreement apart from the deed or titling document." Paragraph 8 further applied the separate writing requirement of paragraph 11 to "any subsequent residence(s), whether primary or secondary homes, purchased by [Husband] during the parties' marriage." And in paragraph 29, the Agreement provided for the award of attorney fees to the prevailing party in an action "enforcing or preventing the breach of any provisions of this Agreement," "for a declaration of his or her rights or obligations" under the Agreement, "or for any other judicial remedy."

**¶6**   In January 2017, the Mayhalls acquired a home at 4577 S. Ambrosia Dr. ("Ambrosia"), signing the warranty deed as "community property with the right of survivorship." To purchase Ambrosia, Husband paid a $92,000 down payment, and the Mayhalls jointly took out a mortgage in both their names because Wife had a higher credit score and was eligible for a first-time-home-buyer tax credit. In 2019 or 2020, the Mayhalls refinanced the home in Wife's name only, and Wife assumed making the mortgage payments. The Mayhalls did not move from Goldfinch to Ambrosia until June 2017 after completing remodeling on Ambrosia. Husband did not sell Goldfinch until October 2019.

**¶7**   In 2022, Wife filed for divorce. At trial, the Mayhalls primarily disputed Ambrosia's character. Wife argued the home was community property because the Mayhalls used both of their resources to acquire Ambrosia, titled the home as community property with a right of survivorship, and therefore purchased the home together. In response, Husband argued the Ambrosia home was his separate property because the Mayhalls never executed a separate written agreement pursuant to the Agreement.

**¶8**   The court determined that paragraph 8 of the Agreement was intended solely to protect Goldfinch as "a sole and separate property that might be sold and converted into another property." The court found that "Ambrosia was not purchased as a replacement or subsequent residence to 'Jeffrey's Residence' because [Husband] kept the Goldfinch property. Additionally, it was not the purchase of a 'second or vacation home' because Goldfinch was maintained and the parties intended that Ambrosia be their primary, marital home." Because the court determined that paragraph 8

did not apply to Ambrosia, it found that Ambrosia was community property. The court then awarded the home to Husband (without objection from Wife) and ordered him to refinance the home in his name and pay Wife one half of the home's equity minus $90,000 for the value of his down payment. The court declined both parties' request for attorney fees because it determined their dispute did not fall within the scope of paragraph 29 of the Agreement.

¶9        Husband appealed and we have jurisdiction.   A.R.S. § 12-2101(A)(1).

## DISCUSSION

### I.    Ambrosia.

¶10        Because a prenuptial agreement is a contract, we review the superior court's interpretation of the Mayhalls' premarital agreement de novo. *See Rand v. Porsche Fin. Servs.*, 216 Ariz. 424, 434, ¶ 37 (App. 2007) (noting contract interpretation is a question of law); *Alulddin v. Alfartousi*, 255 Ariz. 436, 440, ¶ 8 (App. 2023) (noting the enforceability of a premarital agreement is reviewed de novo).  In interpreting a contract, courts "seek to discover and effectuate the parties' expressed intent." *Terrell v. Torres*, 248 Ariz. 47, 49, ¶ 14 (2020).  We construe the contract's language according to its plain, ordinary meaning, attempting "to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous." *Id.* at 50, ¶ 14.  And we interpret a contract in its entirety, seeking to effectuate the parties' intent as to all terms. *Id.* at 49–50, ¶ 14.

¶11        On appeal, Husband asserts that the Agreement is unambiguous and argues the superior court erred by finding that paragraphs 8 and 11 of the Agreement applied only to a home purchased by Husband alone.  Specifically, Husband argues (1) the Agreement was intended to encompass any residence purchased by Husband, whether alone or together with Wife, and (2) Ambrosia was a "replacement residence" or else a "second home" encompassed by paragraph 8 of the Agreement.  According to Husband, the court wrongly concluded the parties jointly purchased Ambrosia by focusing on the title's label as community property.  He asserts the court's reasoning means that properties acquired during the marriage would be Husband's separate property "only if titled in [Husband]'s name alone, but the Agreement expressly contemplated that the residence could be titled in both parties' names yet not affect the character of the property."

4

¶12        Husband misunderstands the court's analysis.  The court found that Ambrosia was neither a replacement residence for Goldfinch nor a second home.  As such, the court found Ambrosia was not subject to paragraph 8.  And, contrary to Husband's second contention, the court "d[id] not find that the warranty deed fulfills the requirement of being a separate writing."  Rather, by finding that "the agreement was only meant to relate to homes purchased by [Husband]," the court determined only that the scope of paragraph 8 did not apply to Ambrosia.

¶13        As to the court's finding that Ambrosia was not a replacement residence, Husband argues the Agreement did not require Husband to sell Goldfinch prior to purchasing Ambrosia because the Agreement discusses "a replacement residence — not houses."  In essence, Husband asserts that Goldfinch was the parties' initial primary residence and any new primary residence is, therefore, a replacement residence for Goldfinch.  But if the parties had intended that their primary residence would always be Husband's separate property, absent a separate written agreement, the Agreement would say so.  It does not.

¶14        Instead, paragraph 8 of the Agreement protects the Husband's separate ownership of Goldfinch.  Paragraph 8 is titled "JEFFREY'S RESIDENCE."  As noted, *supra* ¶ 3, paragraph 8 categorizes as Husband's separate property "[t]his residence [Goldfinch], and any replacement residence or the purchase of any second or vacation homes." And likewise, in paragraph H of the recitals, the parties proclaimed their intent that acquisitions purchased after marriage "of the one *so earning and acquiring*" that acquisition remain as separate property and for "their separate property . . . *and acquisitions there from* [sic] to always and forever remain their separate property." (Emphasis added.)  Similarly, paragraph 11 specifies that the parties "separate real property" shall remain separate absent the parties' separate written agreement.  Read together, recital H, paragraph 8, and paragraph 11 of the Agreement apply to Goldfinch, as Husband's separate property, and any "replacement residence" acquired "therefrom," e.g., through use of Husband's interest in Goldfinch's equity.

¶15        Our interpretation is confirmed by the last paragraph of paragraph 8, which directs that "[t]he provisions in this paragraph 8 and this Agreement relating to [Husband's] current residence shall also apply to any subsequent residence(s), whether primary or secondary homes, *purchased by [Husband]* during the parties' marriage." (Emphasis added.) Again, the Ambrosia home was not purchased solely by Husband during marriage.  It was titled as community property and Husband could not have acquired the home unless Wife signed.

¶16        Husband is correct that the Agreement did not necessarily require the sale of Goldfinch prior to the purchase of a replacement residence. *See supra* ¶ 11. But, in the context of protecting Husband's interest in Goldfinch, a replacement residence suggests that the new residence is substituted for Husband's interest in Goldfinch or is an "acquisition there from [*sic*]." Here, there was no substitution and no indication in the record that the parties acquired Ambrosia through Husband's ownership of Goldfinch. To the contrary, Husband maintained ownership of Goldfinch long after the parties acquired Ambrosia, and approximately two-and-a-half years after the parties moved out of Goldfinch. In this context, the superior court did not err in determining that Ambrosia did not replace Goldfinch.

¶17        If Husband had retained Goldfinch but used his interest in that property to purchase Ambrosia, whether as security for the purchase or through funds otherwise derived from Goldfinch, his replacement residence argument would be much stronger. But Husband retained Goldfinch while the parties purchased Ambrosia with funds derived from an unrelated bank account to make the downpayment. Moreover, months later, the Mayhalls placed Wife as the sole debtor on Ambrosia's mortgage in order to benefit from her higher credit score and to receive her first-time-home-buyer tax credit. And Wife made mortgage payments in 2019 or 2020.[1]

¶18        The superior court did not err by finding Ambrosia was neither a replacement residence nor a second home encompassed by paragraph 8 of the Agreement. Husband also argues the superior court erred by declining to award him attorney fees because it should have found he was the prevailing party. Because we affirm the court's judgment, the court did not err by declining to award Husband attorney fees.

## II.    Attorney Fees and Costs on Appeal.

¶19        Wife requests her attorney fees on appeal pursuant to paragraph 29 of the Agreement. Husband in turn requests fees and costs

---

[1]        Although making mortgage payments would not provide Wife an interest in Goldfinch or a replacement residence, *see supra* ¶ 4, the use of Husband's other funds, her credit, and her mortgage payments, demonstrate that Ambrosia was not a replacement for Husband's interest in Goldfinch. Nor is Ambrosia part of the "sole and separate property of the one so earning and acquiring" contemplated in recital H of the Agreement.

under A.R.S. § 25-324(A) based on the Mayhalls' alleged disparity in resources.

**¶20**		Although the superior court found the scope of paragraph 29 did not encompass the nature of the Mayhalls' dispute, both Husband and Wife interpret paragraph 29 to require an award of fees to the prevailing party in this case.[2]  We therefore decline to award Husband fees under A.R.S. § 25-324(A), but we award Wife her reasonable attorney fees pursuant to paragraph 29 of the Agreement and A.R.S. § 12-341.01(A).  We also award Wife, as the prevailing party, her taxable costs pursuant to ARCAP 21.

### CONCLUSION

**¶21**		We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV

---

[2]		Because Wife did not cross-appeal the court's denial of attorney fees, we do not address whether the court erred by declining to award her fees incurred in the superior court proceeding.